UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELENA A. BELOV,<br><br>Plaintiff,<br><br>v.<br><br>WORLD WILDLIFE FUND, INC.,<br><br>Defendant. | Civil Action No. 21-1529 (JEB) |

## MEMORANDUM OPINION

Plaintiff Elena A. Belov worked for Defendant World Wildlife Fund, Inc. from 2012 until 2020, when WWF declined to renew her limited-term employment. Belov gave birth twice during her employment, taking maternity leave each time. She alleges that, over the span of several years, her supervisor made a series of negative comments about pregnant and nursing women, and that she gave Belov difficulty during her leaves and return to work. After WWF terminated Plaintiff, allegedly for a lack of funding, she filed this suit. Belov alleges that her discharge constituted unlawful sex and pregnancy discrimination, as well as retaliation under Title VII, the Pregnancy Discrimination Act, and the Family and Medical Leave Act.

Defendant now moves to dismiss. The Court will deny the Motion in part and grant it in part, allowing the wrongful-discharge claim to proceed, but dismissing the retaliation counts.

**I.      Background**

According to Plaintiff's Complaint, which the Court must credit at this juncture, she began working at WWF in November 2012 as a Senior Shipping Officer for the U.S. Arctic Program. See ECF No. 1 (Compl.), ¶ 5. Although WWF's U.S. operations are based in

1

Washington, Belov worked remotely from New York. Id., ¶¶ 3–4; see ECF No. 7 (Pl. Opp.) at 9–10. Plaintiff was hired as a "limited term employee," meaning that her employment was for only a set term unless renewed. See Compl., ¶ 6. Her term ended up being renewed nine times between November 2012 and June 2020, or approximately once a year. Id. Throughout Belov's employment, her supervisor was Margaret Williams, Managing Director of WWF's Arctic Program. Id., ¶ 7.

Plaintiff gave birth to her first child in April 2016. Id., ¶ 9. While the Complaint is not entirely clear on the matter, it indicates that she took leave then, but was "initially afraid to ask for additional leave to bond with her infant because Ms. Williams expressed a negative attitude towards employees taking time off. Moreover, Ms. Williams expressed a specific dislike regarding female employees taking maternity leave." Id. After experiencing issues with breastfeeding and childcare, Belov asked Williams if she could work part time for several months once she returned. Id., ¶ 10. Williams told her that if she could not be full time upon returning, then she "should resign." Id. Eventually, however, Williams permitted Belov to work part time before resuming full-time employment in 2017. Id., ¶ 11.

In Spring 2018, Plaintiff informed Williams that she was pregnant again. Id., ¶ 12. Williams "reacted negatively about the impact that Plaintiff's maternity leave would have on Defendant." Id. Belov gave birth in October 2018 and again took maternity leave. Id., ¶ 13. In January 2019, she emailed Williams several times about extending her leave, but Williams did not respond. Id., ¶ 15. After Plaintiff contacted Human Resources about Williams's silence and alerted it to New York State's Family and Medical Leave Act, Defendant allowed her "to take an additional eight weeks of maternity leave." Id., ¶ 16.

Once Plaintiff returned to work in April 2019, she had several disputes with Williams about supposedly essential business travel, which posed a challenged for Belov and her young children. Id., ¶ 18. WWF's Vice President of Human Resources eventually facilitated a call between Belov and Williams, and they determined that none of the trips Williams proposed was essential and that WWF would revisit Plaintiff's travel schedule periodically. Id., ¶ 19. In October 2019, when Belov had a business trip to Iceland planned, Williams advised her against bringing her daughter because doing so would interfere with her ability to "fully participate" in the trip. Id., ¶ 22. Plaintiff "responded that she had a legal right to nurse her daughter every three to four hours," to which Williams responded by warning Belov not to use "legal language." Id., ¶ 23. Also in October, WWF's Human Resources got involved after Williams attempted to force Plaintiff to travel to Alaska for a meeting. Id., ¶ 24. According to Belov, Williams responded by falsely reporting issues with her job performance. Id.

On April 22, 2020, Defendant told Plaintiff that her position was not being renewed for lack of funding. Id., ¶ 25. It then terminated her employment on June 30. Id. After filing a Charge of Discrimination with the Equal Employment Opportunity Commission and receiving a right-to-sue letter, Belov filed this lawsuit in June 2021. Id., ¶¶ 29–30. She brings three counts, alleging that WWF: (1) discriminatorily discharged her; (2) unlawfully retaliated against her under Title VII and the Pregnancy Discrimination Act; and (3) retaliated against her under the Family and Medical Leave Act. Id., ¶¶ 31–45. Defendant now moves to dismiss. See ECF No. 6 (Def. MTD).

**II.   Legal Standard**

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of an action where a complaint fails to "state a claim upon which relief can be granted." Although "detailed factual

allegations" are not necessary to withstand a Rule 12(b)(6) motion, Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570).

In evaluating Defendant's Motion to Dismiss, the Court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citation omitted) (quoting Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979)).  The Court need not accept as true, however, "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint. Trudeau v. FTC, 456 F.3d 178, 193 (D.C. Cir. 2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)).

### III. Analysis

In seeking dismissal, Defendant contends that each count in Plaintiff's Complaint is deficient on its face.  The Court considers them in turn.

#### A. Wrongful Discharge

WWF first argues that Belov's wrongful-discharge claim must be dismissed because she pled no facts plausibly suggesting that she was not renewed because of her membership in a protected class.  See Def. MTD at 4–6.  Given the low motion-to-dismiss bar and the particulars of Defendant's argument, the Court disagrees and will allow Plaintiff to proceed.

Under Title VII, a covered employer may not "discharge any individual . . . because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1).  The Pregnancy Discrimination Act amended Title VII, as relevant here, to make clear that "[t]he terms 'because of sex' or 'on the basis of sex' include, but are not limited to, because of or on the basis of pregnancy, childbirth,

or related medical conditions." 42 U.S.C. § 2000e(k); see Young v. United Parcel Serv., Inc., 135 S. Ct. 1338, 1352 (2015). Belov contends that she was terminated because of her sex, particularly her pregnancies and nursing upon returning to work. See Pl. Opp. at 5–6. "Although the D.C. Circuit has yet to address" whether "lactation" is a medical condition related to childbirth for purposes of the PDA, a number of courts have concluded that it is. See Allen-Brown v. D.C., 174 F. Supp. 3d 463, 478 & n.9 (D.D.C. 2016) (collecting cases). The EEOC, moreover, "has also adopted the position that lactation is protected by the PDA in its enforcement guidance." Id. at 479 (citing EEOC Guidance No. 915.003, Pregnancy and Related Issues (June 25, 2015), 2015 WL 4162723). In light of those persuasive authorities — as well as Defendant's lack of challenge on this question, see Def. MTD at 4–6 — the Court will presume that a discrimination claim based on lactation is available to Plaintiff.

As for proof such discrimination, Belov appears to contend that the statements made by Williams constitute direct evidence. See Pl. Opp. at 6. That argument, however, does not mature past its infancy. "To qualify as direct evidence, a statement or remark must 'itself show[] . . . bias in the employment decision.'" Conn v. Am. Nat'l Red Cross, 149 F. Supp. 3d 136, 146 (D.D.C. 2016) (alterations in original) (quoting Wilson v. Cox, 753 F.3d 244, 247 (D.C. Cir. 2014)). "Direct evidence does not include stray remarks in the workplace, even if made by decision-makers, where the remarks are unrelated to the decisional process itself." Crawford v. Barr, No. 17-798, 2020 WL 7051554, at *4 (D.D.C. Sept. 24, 2020) (quoting Beeck v. Fed. Exp. Corp., 81 F. Supp. 2d 48, 53–54 (D.D.C. 2000)). While Belov has pled facts indicating bias on the part of Williams against pregnant and nursing women, she alleges no facts expressly linking her comments to the ultimate discharge decision. See Compl., ¶¶ 9–25.

"Absent direct evidence, discrimination claims proceed under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Smith v. Blinken, No. 18-3065, 2021 WL 3737455, at *4 (D.D.C. Aug. 24, 2021). "Under this formula, an employee must first make out a prima facie case of retaliation or discrimination. The employer must then come forward with a legitimate, nondiscriminatory or non-retaliatory reason for the challenged action. If the employer meets this burden, the McDonnell Douglas framework falls away and the factfinder must decide the ultimate question: whether the employee has proven intentional discrimination or retaliation." Morris v. McCarthy, 825 F.3d 658, 668 (D.C. Cir. 2016) (citations omitted). "A jury may infer discrimination from, among other things, 'evidence of discriminatory statements or attitudes on the part of the employer.'" Id. (quoting Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (*en banc*)).

As to the first two steps, Belov has made out a *prima facie* case, and the Complaint acknowledges that WWF advanced a legitimate explanation for terminating her employment: her position was not being renewed "due to a lack of funding." Compl., ¶ 25. The central question is thus whether Plaintiff has stated a claim of intentional discrimination based on "all the evidence, including 'any evidence the plaintiff presents to attack the employer's proffered explanation for its actions' and 'any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer).'" Iyoha v. Architect of the Capitol, 927 F.3d 561, 566 (D.C. Cir. 2019) (quoting Salazar v. Wash. Metro. Transit Auth., 401 F.3d 504, 508 (D.C. Cir. 2005)). Given that this is a motion to dismiss, not one for summary judgment, the Court looks to the Complaint alone to decide this question.

In any event, the answer is yes. Belov's Complaint alleges a pattern of behavior by Williams, over the course of several years, that evinces bias and a discriminatory attitude toward pregnant and nursing women. For instance, as early as 2016, Williams had "expressed a negative attitude towards employees taking time off" as well as "a specific dislike regarding female employees taking maternity leave." Compl., ¶ 9. Williams later told Belov that if she could not work full time given childcare and nursing requirements, then she "should resign." Id., ¶ 10. The Complaint alleges that Williams again displayed similar sentiments in 2018, when Belov informed her of her second pregnancy, to which Williams "reacted negatively about the impact that Plaintiff's maternity leave would have on Defendant." Id., ¶ 12. And in October 2019, once Belov had returned to work from her second maternity leave, Williams advised her against taking her daughter on a business trip because doing so would interfere with Plaintiff's ability to "fully participate" in the trip. Id., ¶ 22.

To be sure, "an isolated [sex]-based remark unrelated to the relevant employment decision [does not], without more, permit a jury to infer discrimination." Morris, 825 F.3d at 669. But the Supreme Court and the D.C. Circuit have "caution[ed] lower courts against discounting discriminatory statements 'not made in the direct context' of the challenged employment action," or "made significantly before the relevant employment action." Id. at 670 (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150–51 (2000)). Indeed, our Court of Appeals has explained, "Even if such a statement carries less weight than one made at the time of the [adverse employment action], it is nonetheless probative evidence of a supervisor's discriminatory attitude, at least when it is targeted directly at the plaintiff or is one of a pattern of similar remarks." Id. The Circuit has elsewhere admonished, "A district court errs in 'reviewing each racially charged remark individually and finding it insufficient' rather

than considering the statements 'alongside any additional statements—and all other evidence—to determine whether a plaintiff has met [his] burden." Iyoha, 927 F.3d at 568 (quoting Morris, 825 F.3d at 670). With those guideposts in mind, the Court concludes that Williams's comments — when taken together and in combination with granting Plaintiff the benefit of all inferences that can be drawn in her favor from the Complaint — support a plausible claim of sex discrimination. The pattern of comments shows evidence of a discriminatory attitude against women, pregnant women, and lactating women, as well as a targeting of Belov on the basis of her sex and pregnancy.

"Of course, [Plaintiff] must show more than a general bias against [female and pregnant] employees; she must also introduce enough evidence for a reasonable jury to find that her [termination] was motivated by that bias." Morris, 825 F.3d at 670. Belov has done enough at this stage to "cast[] doubt on the objective validity of the employer's explanation." Id. at 671. The sequence of events involving Williams could plausibly lead a factfinder to be "'quite suspicious' of the sincerity of" the proffered rationale and to conclude that it "was pretext for [sex-based] discrimination." Id. at 671–72 (quoting Evans v. Sebelius, 716 F.3d 617, 622 (D.C. Cir. 2013)). "Indeed, a reasonable jury could treat evidence of a decisionmaker's broad-based [sex-based] animus or bias as corroborating evidence that such animus or bias infected a particular employment decision; it is not unreasonable to doubt that an employer quarantines her animus or bias to day-to-day treatment of colleagues, away from decisions about hiring, or promotion, or termination." DeJesus v. WP Co. LLC, 841 F.3d 527, 536 (D.C. Cir. 2016); see also, e.g., Aka, 156 F.3d at 1294 (quoting St. Mary's Honor Center v. Hicks, 509 U.S. 502, 511 (1993)) ("If 'disbelief is accompanied by a suspicion of mendacity,' . . . the likelihood of intentional discrimination is increased, permitting the factfinder to infer discrimination more

8

readily."); Hall v. Washington Metro. Area Transit Auth., No.19-1800, 2020 WL 5878032, at *11 (D.D.C. Oct. 2, 2020)  (factfinder could "infer intentional discrimination from its suspicion of [supervisor's] truthfulness in combination with the evidence of her discriminatory attitude towards individuals with disabilities outlined above"); Smith, 2021 WL 3737455, at *5 ("The statements about Ms. Smith's national origin taken as a whole, in other words, permit a jury to infer discrimination or pretext.").

None of the above is meant to suggest that this count will ultimately prevail.  Belov, for example, has not yet identified any similarly situated comparators who were treated more favorably, even though that type of evidence is "[p]robably the most commonly employed method of demonstrating that an employer's explanation is pretextual."  1 Lex K. Larson, Employment Discrimination § 8.04, at 8–66 (2d ed. 2007), quoted in Brady v. Office of the Sergeant at Arms, 520 F.3d 490, 495 (D.C. Cir. 2008).  Another potential issue that Plaintiff may have to address down the line is Williams's role in the termination decision.  Although the Complaint is not entirely clear about her involvement, see Compl., ¶ 25, Defendant makes no argument on this score.  See Def. MTD at 4–6.  The Court thus has no occasion here to engage in a "cat's paw" analysis — i.e., to weigh her involvement in the discharge.  See Morris, 825 F.3d at 668.  While those and other potential hurdles may loom large in the future, for now it is enough for the Court to conclude that Belov has "state[d] a claim to relief that is plausible on its face."  Iqbal, 556 U.S. at 678 (citation omitted).

B.  Title VII Retaliation

Up next is Belov's Title VII retaliation claim.  WWF contends that this count should be dismissed because Plaintiff: (1) does not allege that she engaged in statutorily protected activity;

9

...

and (2) in any event, has not established a causal connection between any protected activity and her termination. The Court concurs.

"Where, as here, a plaintiff offers only circumstantial evidence of retaliation, her claim is governed by the burden-shifting framework of McDonnell Douglas." Solomon v. Vilsack, 763 F.3d 1, 14 (D.C. Cir. 2014). "Under that framework, [a plaintiff] must 'first establish a prima facie case of retaliation by showing' that (i) '[s]he engaged in statutorily protected activity'; (ii) '[s]he suffered a materially adverse action by h[er] employer'; and (iii) 'a causal link connects the two.'" Id. (quoting Jones v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009)). The crux of Defendant's argument is that the Court need proceed no further because Belov has not alleged a *prima facie* case of retaliation.

Title VII makes it unlawful to retaliate "against any individual . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). In other words, "[a]n activity is protected for the purposes of a [Title VII] retaliation claim if it involves opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment." Beyene v. Hilton Hotels Corp., 815 F. Supp. 2d 235, 247 (D.D.C. 2011), aff'd, 573 F. App'x 1 (D.C. Cir. 2014) (internal quotation marks omitted). "[N]ot every complaint entitles its author to protection from retaliation under Title VII," however, "because the plaintiff 'must demonstrate that he complained [to the employer] of some unlawful discrimination based on his membership in a protected class.'" Deppner v. Spectrum Health Care Res., 325 F. Supp. 3d 176, 186–87 (D.D.C. 2018) (quoting Beyene, 815 F. Supp. 2d at 247).

Here, Belov has not sufficiently alleged that she engaged in any statutorily protected activity. In her Opposition, she asserts that she did so a number of times, including when she "sought help from her colleagues" to obtain permission to work part time upon returning from leave, "invoked New York State's Family and Medical Leave Act," complained to Human Resources that Williams was forcing her to take unnecessary business trips, and "invoked her legal right to nurse her infant daughter every three (3) to four (4) hours in a conversation with Ms. Williams." Pl. Opp. at 7–8.

The problem for Belov, however, is that none of the instances the Complaint references — numerous as they may be — involves "opposing an employment practice made unlawful by the statute under which she has filed her claim of retaliation." Lemmons v. Georgetown Univ. Hosp., 431 F. Supp. 2d 76, 91–92 (D.D.C. 2006). For instance, she provides no support for the statement that seeking help from colleagues to secure part-time employment is a form of "oppos[ing] . . . an unlawful employment practice" or "ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing." 42 U.S.C. § 2000e-3(a). So, too, for the Complaint's references to Plaintiff's "involv[ing] Defendant's human resources," which come in the context of her supervisor's not responding to emails and asking Belov to go on certain business trips. See Compl., ¶¶ 15, 19.

With respect to Belov's contention that she "invoked" her legal rights at various points, see Pl. Opp. at 6–8, all that the Complaint states is that she "alerted Defendant to New York State's Family and Medical Leave Act," after which "Defendant allow[ed] Plaintiff to take an additional eight (8) weeks of maternity leave," and that she told her supervisor that "she had a legal right to nurse her daughter every three (3) to four (4) hours." Compl., ¶¶ 16, 23. While those allegations at least relate to WWF's handling of Belov's pregnancy and nursing, they do

11

not "demonstrate that she had alleged harassment or discrimination based on her [sex], or some other category protected by [Title VII], before the [allegedly] retaliatory conduct occurred." Lemmons, 431 F. Supp. 2d at 92. Some could conceivably support an FMLA-retaliation claim, but not one under Title VII.

Plaintiff's final allegation of protected activity runs into the same issue. Her Complaint states that, after "Williams attempted to force Plaintiff to travel to Alaska for a four (4) hour meeting which other out-of-state participants attended via Zoom," Belov "sought the assistance of Defendant's human resources department regarding this blatant violation of company policy, Plaintiff's state and federal rights, and the parties['] limited travel agreement." Compl., ¶ 24. Without specifying which company policies or legal rights were allegedly violated, however, there is no reason to think that Plaintiff's going to Human Resources about a travel dispute qualifies as protected activity under Title VII. Indeed, Belov nowhere alleges that she reported sex discrimination to Human Resources. Id. She therefore has failed to state a *prima facie* case of retaliation under Title VII. See, e.g., Payne v. Salazar, 899 F. Supp. 2d 42, 52–53 (D.D.C. 2012) (letter requesting leave not protected activity because plaintiff did not allege unlawful discrimination); Coleman v. Potomac Elec. Power Co., 422 F. Supp. 2d 209, 213–14 (D.D.C. 2006) (no protected activity when plaintiff "complained about the evaluation process, his supervisors, and harassment but not about matters protected by anti-discrimination laws" (internal quotation marks omitted)); Logan v. Dep't of Veteran Affairs, 404 F. Supp. 2d 72, 77 (D.D.C. 2005) (complaints about employer practices not protected activity because they did not "include a claim of discrimination based upon race, color, religion, sex, or national origin").

Even if Plaintiff's activity could be considered protected, her Title VII retaliation claim would nonetheless fail because she has not pled a causal connection between any such activity

and her termination. "To establish a causal connection between the protected activity and the termination — in the absence of direct evidence — a plaintiff may show 'that the employer had knowledge of the employee's protected activity, and that the adverse personnel action took place shortly after that activity.'" Keys v. Donovan, 37 F. Supp. 3d 368, 372 (D.D.C. 2014) (quoting Mitchell v. Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985)). "Although 'neither the Supreme Court nor the [D.C. Circuit] has established a bright-line three-month rule,' this Circuit has generally found that such a gap between the protected activity and the adverse employment action negates the temporal proximity needed to prove causation." Keys, 37 F. Supp. 3d at 373 (quoting Hamilton v. Geithner, 666 F.3d 1344, 1357–58 (D.C. Cir. 2012)); see also Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273–74 (2001) (citing with approval cases rejecting proximity of three and four months as evidence of causation).

The Complaint indicates that there was at least a six-month gap between the last allegedly protected activity and Belov's notice of termination. Specifically, Plaintiff alleges that she asserted her right to nurse her daughter and contacted Human Resources about the travel dispute in October 2019, and that WWF informed her on April 22, 2020, that her position would not be renewed, effective June 30. See Compl., ¶¶ 22–25. While Plaintiff claims in her Opposition that Williams "responded to Plaintiff's protected activity" after October 2019, that response is not relevant to measuring when Belov last engaged in protected activity. See Pl. Opp. at 8. In any event, Belov admits that "the Complaint does not allege when" Williams took that action, id., and "oppositions to dispositive motions are no place to stick in motions to amend." Hudson v. Am. Fed. of Gov't Employees, 308 F. Supp. 3d 388, 396 (D.D.C. 2018).

As courts in this circuit have routinely "found that a three to four month gap between the protected activity and the adverse employment action is too great to establish an inference of

13

causation," the Court here follows suit and concludes that the six-month interval between Belov's last allegedly protected activity and her termination cannot support a causal nexus between the two. See Mokhtar v. Kerry, 83 F. Supp. 3d 49, 81 (D.D.C. 2015), aff'd, No. 15-5137, 2015 WL 9309960 (D.C. Cir. Dec. 4, 2015); see also Keys, 37 F. Supp. 3d at 373.

### C. FMLA Retaliation

The Court last takes up Belov's claim of FMLA retaliation. Just as under Title VII, the "elements of a prima facie case of FMLA retaliation are the well-known triad: (1) the employee 'engaged in a protected activity under this statute'; (2) the employee 'was adversely affected by an employment decision'; and (3) 'the protected activity and the adverse employment action were causally connected.'" Gordon v. U.S. Capitol Police, 778 F.3d 158, 161 (D.C. Cir. 2015) (quoting Gleklen v. Democratic Cong. Campaign Comm., Inc., 199 F.3d 1365, 1368 (D.C. Cir. 2000)). "[C]ourts have generally recognized," moreover, that "aside from very limited circumstances, eligibility under the FMLA is a prerequisite to make an FMLA retaliation claim." Dougherty v. Cable News Network, 396 F. Supp. 3d 84, 112 (D.D.C. 2019) (collecting cases); see also 29 U.S.C. § 2617(a)(1) ("Any employer who violates [the FMLA] shall be liable to any eligible employee affected . . . .) (emphasis added). Here, Plaintiff does not dispute that prerequisite.

As with the Title VII retaliation count, WWF contends — and the Court agrees — that the FMLA retaliation claim is infirm for two independent reasons. First, Plaintiff has not pled that she was eligible for FMLA leave while employed at WWF. In a provision known as the "50/75 provision," e.g., Hackworth v. Progressive Cas. Ins. Co., 468 F.3d 722, 726 (10th Cir. 2006), the FMLA makes clear that "[t]he term 'eligible employee' does not include" anyone who works in a location where her company employs fewer than 50 employees within 75 miles. See

14

29 U.S.C. § 2611(2)(B)(ii).  Defendant points out that the Complaint does not assert that Belov satisfied the 50/75 provision, or even more generally that she was eligible for FMLA leave.  See Compl., ¶¶ 41–45.  And because Plaintiff worked from her home in New York, while WWF is based in Washington, id., ¶¶ 3–4, the Court cannot draw the unpled inference that she must have been eligible under the 50/75 provision.  Her FMLA retaliation claim thus fails as a matter of law.

Belov's arguments to the contrary are unavailing.  She primarily contends that Defendant's attempts to prove that she did not satisfy the 50/75 provision rely on information outside the pleadings.  See Pl. Opp. at 9–10.  Plaintiff is correct that, "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  But the Court is not relying on matters outside the Complaint or definitively concluding that Plaintiff did not satisfy the 50/75 provision.  Rather, it concludes merely that Belov did not so much as allege that she was eligible under the FMLA in her Complaint.  See Compl., ¶¶ 41–45.  In that regard, it is Plaintiff who impermissibly attempts to present new facts outside the pleadings when she asserts, based on LinkedIn searches, that it is "entirely possible, especially during the continued pandemic, that Defendant could employ fifty (50) or more people within seventy-five (75) miles of New York."  Pl. Opp. at 10.

Second, even if Belov had alleged FMLA eligibility, she has not pled the necessary causal nexus between her involvement in protected activity and her termination.  See Gordon, 778 F.3d at 161.  She alleges that "Defendant took an adverse employment action against Plaintiff when they terminated her based on her decision to take FMLA leave to care for her infant daughter."  Compl., ¶ 43.  Recall, Belov took leave from approximately October 2018

15

until April 2019, and she was notified in April 2020 that her limited-term employment would not be renewed. Id., ¶¶ 12–17, 25.

Courts in this district apply a similar temporal requirement to FMLA retaliation cases as to Title VII retaliation cases. See, e.g., George v. Molson Coors Beverage Co. USA, LLC, No. 20-1914, 2020 WL 5702089, at *7 (D.D.C. Sept. 24, 2020) (explaining in FMLA context that "[a] gap of three months or more is generally too long to support an inference of causation"). And the year-long period between the end of Plaintiff's leave and WWF's decision not to renew her contract is greater than that at issue in her Title VII retaliation claim. In light of that temporal gap — as well as the fact that Defendant did renew Plaintiff's contract once she returned from leave in 2019, see Compl., ¶ 6; Def. MTD at 8 n.2 — the Court concludes that Belov has not sufficiently alleged that her discharge was caused by engaging in activity protected by the FMLA.

**IV.     Conclusion**

For the foregoing reasons, the Court will grant Defendant's Motion to Dismiss in part and deny the Motion in part. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date: October 13, 2021

16